IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **FRED E. RILEY, JR.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action Number |
| ) | **2:02-cv-2712** |
| **BIRMINGHAM BOARD OF** ) | |
| **EDUCATION and EVELYN BAUGH,** ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

In this case brought under 42 U.S.C. § 1983 ("Section 1983") and 42 U.S.C. § 2000e *et seq.* ("Title VII"), Plaintiff Fred E. Riley ("Riley") claims that Defendants Birmingham Board of Education ("the Board") and its Ensley High School ("EHS") Principal Evelyn Baugh discriminated against him because of his race. After one football season at EHS, Plaintiff's head football coach contract was not renewed; thereafter, he was not selected as the head football coach at Carver High School.

The Defendants have separately moved for summary judgment. Based on the undisputed facts construed in a light most favorable to the Plaintiff, the motions are due to be granted.

## A.  FINDINGS OF UNDISPUTED FACTS

1. Plaintiff is a white male.  Prior to his employment with the Board, Plaintiff had coached at both the collegiate and high school levels.  His extensive coaching career spanned sixteen years at nine different schools.  (Doc. 31 at  Ex. 3, Pl.'s Resume.)

2. Defendant Evelyn Baugh is a black female.

3. A majority of the members of the Birmingham Board of Education are black citizens.

4. On May 30, 2000, Plaintiff applied for a teaching position with the Birmingham City School System.  (Doc. 31 at Ex. 4, Plaintiff's Employment Application.)  On his application form, Plaintiff affirmed "that all information provided in the application is true and correct to the best of [his] knowledge."  The form indicated that the employment contract would become null and void if the information provided therein proved to be false.[1]

5. An "Interview Committee" interviewed Plaintiff after he submitted his employment application. The Interview Committee consisted of the EHS principal, a supervisory employee in the Board's Athletic Department, school employees, and parents. At Baugh's  urging, the Committee recommended to the superintendent that Plaintiff be awarded the position.   (Doc. 31 at Ex. 20, Coats Aff. ¶ 5.)

---

[1] Plaintiff provided false information on his employment application.  Although he stated on the application that he had never "been asked to resign or been discharged from any position teaching or otherwise," in his deposition he admitted that he had been fired or terminated twice before his employment by the defendant Board. (Doc. 31 at Ex. 1, Riley Dep. at p. 129.)

6. Defendant Baugh made a non-binding recommendation to the Superintendent that Plaintiff be hired for the 2000-2001 school year as an Ensley High School teacher and head football coach. Acting on that recommendation, the Superintendent recommended to the Board that Plaintiff be hired. The Board voted to approve the recommendation.

7. As compensation for coaching duties, Birmingham coaches receive a pay "supplement," in addition to a teaching salary. While coaching supplements vary, a head coach receives a higher supplement than an assistant coach. (Doc. 31 at Ex. 2, Drew Dep. at pp. 44-45.)

8. Plaintiff's employment contract with the Board as a "Health & P.E. Teacher/Head Football Coach" at Ensley High School was effective from August 9, 2002, to May 30, 2001. (Doc. 31 at Ex. 22., Pl.'s Employment Contract.)

9. On September 19, 2000, Ensley Athletic Director Mitzi Jackson placed a letter in Plaintiff's employment file. Jackson's letter indicated Plaintiff had repeatedly failed to submit students' social security cards, birth certificates and insurance information. Jackson indicated that the team would have to forfeit future games if the information was not submitted immediately. (Doc. 31 at Ex. 23, Letter from Jackson to Riley, Sept. 19, 2000.)

10. In Plaintiff's view, the Jackson letter was not a reprimand, but simply resulted from a misunderstanding regarding whether he or Jackson was responsible for submitting

the information.  Once he received the letter clarifying the matter, Plaintiff submitted the required information.  (Doc. 31 at Ex. 1, Riley Dep. at pp. 141-44.)

11.  Of Plaintiff's seven assistant coaches, five were black.  In February 2001, Plaintiff evaluated his assistant coaches and suggested to Baugh that the contracts of three black assistant coaches not be renewed.

12.  After Plaintiff made these recommendations, Baugh placed a letter in his file on February 26, 2001.  The letter related to Plaintiff that teachers were complaining that football players were cutting class.  In her letter, Baugh reprimanded Plaintiff for holding classes in the weight room, rather than in the main gym; Baugh also noted that unauthorized students were loitering around the weight room. (Doc. 39 at Ex. 8, Letter from Baugh to Riley, Feb. 26, 2001.)   Additionally, Baugh instructed Plaintiff that he should call the roll and notify her of any students who were present, but not enrolled in his class.  (*Id.*)

13. The EHS football team had won only four games in three years before the Board hired Plaintiff.   During the year in which Plaintiff served as EHS head coach, the team won four games.  (Doc. 39 at Ex. 10, Riley Aff. ¶¶ 8-9.)   Also, the average point differential of the football players increased from "17 to 17.5" (*Id*. ¶ 9.)

14.  During the school year, the EHS Athletic Director received complaints about Plaintiff's performance from assistant coaches, parents, and members of the football team. (Doc. 31 at Ex. 18, Jackson Aff.¶¶ 55-57.)

15. On April 20, 2001, Defendant Baugh evaluated Plaintiff on a standard head coach form provided by the Board. The form listed three areas of evaluation: Professional and Personal Relationships, Coaching Performance, and Related Coaching Responsibilities. A coach may be rated as 1 (Effective), 2 (Needs Improvement), or 3 (Unsatisfactory).

16. Baugh did not rate Plaintiff as unsatisfactory in any areas. In the Professional and Personal Relationships area, Baugh rated Plaintiff as effective in fourteen (14) of the fifteen (15) factors. Baugh rated Plaintiff as needing improvement in working cooperatively with the Athletic Director. In the Coaching Performance area, he fared less well. Baugh judged Plaintiff to be effective in six (6) out of twenty (20) factors; marginally effective in two (2) factors; and needing improvement in twelve (12) factors. In the Related Coaching Responsibilities area, Baugh rated Plaintiff effective in six (6) of the applicable eight (8) factors; and needing improvement in two (2) factors. (Doc. 39 at Ex. 9, Riley Head Coach Evaluation Form.)

17. In summary, Plaintiff was deemed to be deficient in 15 of the 43 areas in which he was evaluated. Baugh determined that Riley needed improvement in areas such as follows: (1) being fair, understanding, tolerant, sympathetic and patient with team members; (2) providing leadership and attitudes that produce positive efforts by participants; (3) working cooperatively with the Athletic Director; (3) developing respect by example in appearance, manners, and conduct during a contest; and (4) using ethical

means of motivation. (*Id.*)

18. In her written evaluation comments, under the heading "weakness," Baugh noted the following deficiencies: "communications with coaches, athletic director, etc.; sensitivity to needs of others involved in program." (*Id.*)

19. Baugh also completed a separate teaching evaluation for Plaintiff. Baugh rated Plaintiff positively in every area of his teaching evaluation. ( Doc. 39 at Ex. 19.)

20. Baugh did not recommend the nonrenewal of Riley's teaching contract.

21. At the end of her performance evaluation, Baugh informed Plaintiff that she had decided to recommend that his coaching contract not be renewed. (Doc. 31 at Ex. 19, Baugh Dep. at p. 144.)

22. After Baugh recommended the nonrenewal of Plaintiff's coaching contract, she convened a meeting with the football players to inform them of her decision. During this meeting, Baugh said: "We have to take care of our own because it is a hard world out there, and no matter what, people are going to look at us by our skin color." (Doc. 39 at Ex. 14, Grace Aff. ¶ 6.)

23. The superintendent accepted Baugh's recommendation, and, in turn, recommended to the Board that Plaintiff's coaching contract not be renewed.

24. On May 7, 2001, the Board approved the superintendent's recommendation that Baugh's coaching contract not be renewed and that his teaching contract be renewed.

25. After learning that his EHS coaching contract would not be renewed, Plaintiff

applied for a position as an assistant coach and teacher at Huffman High School ("HHS"). The Board approved Plaintiff's application, and he was transferred to HHS.

26. Plaintiff then applied and interviewed for a head coaching position at the Board's Carver High School ("CHS"). The Interview Committee was unimpressed with Riley's interview performance.

27. The Interview Committee unanimously recommended Jerry Dismuke, a black coach who had won a state championship, for the CHS head football coaching vacancy. The Board then offered the job to Dismuke. (Doc. 38 at ¶¶ 14, 16.) Plaintiff "does not contend that he was equally or better qualified for the position as Dismuke. (Doc. 31 at Ex. 1, p. 183.)

28. Unable to obtain a release from his contract with the Pickens County School System, Dismuke declined the defendant Board's offer shortly before the beginning of the football season of the 2001-2002 school year. (Doc. 31. at Ex. 30, ¶ 63.) For the sake of continuity, and on an interim basis, the Board then awarded the position to CHS's assistant football coach, Franklin Roberts ("Roberts"). Roberts had worked with CHS's football team the preceding summer and established rapport with its members.

29. On July 15, 2001, Plaintiff resigned his position with the Board to accept a position with a different school system.

30. The Board later filled the CHS head coaching vacancy after Plaintiff tendered his resignation.

31.  Plaintiff was never a tenured employee with the Board.

### B.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the movant demonstrates that there is no genuine issue as to any material fact and that, based upon the undisputed facts, the movant is entitled to judgment as a matter of law.  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *see also* Fed. R. Civ. P. 56(c).

The party requesting summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which the moving party believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When ruling on a motion for summary judgment, the court must view the facts in a light most favorable to the non-moving party.  *See, e.g., Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1196 (11th Cir. 1997).  "The district court should 'resolve all reasonable doubts about the facts in favor of the non-movant' . . . and draw 'all justifiable inferences . . . in his favor  . . . .'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437  (11th Cir. 1991).  "All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *See Hayden v. First Nat'l Bank of Mt. Pleasant*, 595 F.2d 994, 996-97 (5th Cir. 1979).  Evidence that is merely colorable,

8

conclusory, or conjectural does not create a genuine issue of material fact. *See, e.g.*, *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988); *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989).

### C.  THE SUBSTANTIVE LAW

A plaintiff in a race discrimination case may prove his case either by direct evidence or by circumstantial evidence. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527 (11th Cir.1997). "'Direct evidence' is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.I. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).

Under the various permutations of *McDonnel Douglas Corp. v. Green,* 411 U.S. 792 (1973), the plaintiff in a circumstantial evidence case brought under Title VII must first establish a *prima facie* case of racial discrimination. To do so, he must prove the following elements: 1) that he is a member of a protected class, 2) that he applied or was qualified for a position, 3) that he was denied the position, and 4) that the position was awarded to a person of a different race. If the plaintiff carries his *prima facie* burden of proof, then the defendant must articulate a valid, non-discriminatory reason for the adverse employment action. The plaintiff then has the burden of proving that the articulated reason for the discharge is either a pretext for discrimination or that it is unworthy of credence. *See Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 920-21

(11th Cir. 1993); *Combs*, 106 F.3d at 1527.

Where a plaintiff complains of racial discrimination under both Title VII and Section 1983, the analysis is the same. *Cross v. State of Ala.*, 49 F.3d 1490, 1508 (11th Cir. 1995)(quoting *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 (11th Cir. 1982)); *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. 1982). The *McDonnell Douglas* analytical framework is applicable. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 n.2 (1993).

To impose liability against an individual defendant under Section 1983,[2] the plaintiff must prove that the defendant official was a final decisionmaker with respect to the adverse action complained of. *Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir. 2003). The determination of whether a defendant is a final decisionmaker is a question of law.[3] *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citing *St. Louis v. Prapprotnik*, 485 U.S. 112, 108 (1988)).

Alabama law expressly delegates to boards of education, not principals, the final decisionmaking authority with respect to the hiring and firing of school employees. *See*

---

[2] There is no individual liability under Title VII.

[3] The following factors are relevant to the "final decisionmaker" inquiry: (1) the contents of employee handbooks or organizational charts of the official body; (2) the statutory authority of the defendant official; and (3) whether the official's recommendation could be immediately or independently effectuated, or whether it required further action or review by another body. *See Quinn v. Monroe County*, 330 F.3d 1320, 1326 (11th Cir. 2003)(citing with approval *Hitt v. Connell*, 301 F.3d 240 (5th Cir. 2002)).

ALA. CODE §16-11-17 (2001).  Section 16-11-17 provides:

> The city board of education shall fix the salaries of all employees and may suspend or dismiss any principal or teacher or supervisor or attendance officer or other regular employee so appointed on the written recommendation of the city superintendent of schools . . . when in the opinion of the board, the best interests of the schools may require . . ..

See ALA. CODE §16-11-17 (2001).

Alabama law provides that public school teachers shall be deemed offered re-employment unless the *employing board of education* gives written notice of termination. ALA. CODE §16-24-12 (2001).

The role of school principals is clearly defined in Alabama law:

> A principal . . . shall make written *advisory* recommendations to the chief executive officer [superintendent] regarding the appointment, assignment, promotion, transfer, and cancellation of the contracts of all personnel assigned to any school or campus under his or her responsibility . . .. These *advisory recommendations shall not be binding* upon the chief executive officer [superintendent], and the chief executive officer shall have final authority for all personnel assignments within the applicable school system.

ALA. CODE §16-24B-4(d) (2001) (emphasis added).

In Alabama, a non-tenured teacher has no right to re-employment by the school board– even where he has received a favorable evaluation.  *Belcher v. Jefferson County Bd. of Ed.*, 474 So. 2d 1063 (Ala.1985); *Richardson v. Terry,* 2004 WL 541815 (Ala. 2004)*;* ALA. CODE §§ 16-8-23, 16-9-23, 16-24-12 (2001).

To prove a claim of constructive discharge, a plaintiff must establish that his employer deliberately made his working conditions so intolerable that he had no

11

reasonable alternative to resignation. *See Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991).

### C. CONCLUSIONS OF LAW

1. Defendant Baugh was not a final decisionmaker for the Birmingham Board of Education with respect to the nonrenewal of Plaintiff's coaching position. She is therefore entitled to judgment as a matter of law on Plaintiff's claims.

2. Plaintiff has failed to carry his burden of proof that Defendant Birmingham School Board's articulated reasons for the non-renewal of Plaintiff's coaching contract at Ensley High School were either a pretext for racial discrimination or unworthy of credence.

3. Plaintiff has failed to carry his burden of proof that he was constructively discharged as the head coach at Ensley High School.

4. Plaintiff has failed to carry his burden of proof that Defendant Birmingham Board of Education's articulated reasons for his non-selection for the position of head football coach at Carver High School were either a pretext or unworthy of credence.

Based on these Findings of Undisputed Facts and Conclusions of Law, both

Defendants are entitled to summary judgment on all of the claims asserted against them.

Done this 7th day of January, 2005.

_____
U.W. Clemon
Chief United States District Judge